412 F.2d 104
 EIGHTY-NINER INN, LTD., a corporation, Plaintiff,
v.
AMERICAN EMPLOYERS' INSURANCE COMPANY et al., Defendants,
Eighty-Niner Associates, a limited partnership, Defendant-Appellee, and
State Capitol Bank, Intervenor-Appellant, et al., Intervenors.
 No. 56-68.
 United States Court of Appeals Tenth Circuit.
 June 24, 1969.
 Rehearing Denied August 13, 1969.
 
 G. M. Fuller, Oklahoma City, Okl. (Fuller, Davis, Henderson & Tubb, Oklahoma City, Okl., of counsel, with him on the brief), for appellant.
 Coleman Hayes, Oklahoma City, Okl. (Russell Thompson, Oklahoma City, Okl., and Monnet, Hayes, Bullis, Grubb & Thompson, Oklahoma City, Okl., of counsel, with him on the brief), for appellee.
 Before MURRAH, Chief Judge, SETH, Circuit Judge, and CHRISTENSEN, District Judge.
 SETH, Circuit Judge.
 
 
 1
 This action was commenced by the lessee of a motel to recover on standard fire insurance policies covering the buildings and personal property and containing "Loss of Earnings Endorsements" or business interruption insurance. Certain creditors intervened in the action including the appellant, State Capitol Bank. The appellee, Eighty-Niner Associates, was the lessor of the motel at the time it was damaged, and was named defendant in the proceedings.
 
 
 2
 The only parties remaining in the action on appeal are the lessor, Eighty-Niner Associates, and the intervening claimant, State Capitol Bank. The issue here is which of the remaining parties has the right to the proceeds recovered on the business interruption insurance. The appellant bank claims under an assignment of insurance proceeds given as security by the lessee. The appellee lessor claims under the provisions of its lease.
 
 
 3
 The trial court found and held that under the lease, all the remaining proceeds from the business interruption insurance coverage should go to the lessor for the reconstruction of the motel.
 
 
 4
 The record shows that during the initial construction of the motel, the builder experienced financial difficulties, and was apparently unable to meet certain claims of creditors. The property was sold to appellee, and leased back to the builder, the lessee in this action. Some years later on July 25, 1965, a tornado partly destroyed the improvements and extensive repairs were required. There was a delay in the adjustment of this loss. Repairs were undertaken, but before completion the premises were again damaged on August 15, 1965, this time by fire.
 
 
 5
 Subsequently there was recovery upon the insurance coverage including the policies relating to physical damage as well as on the policies for business interruption. The landlord and the tenant were both named insureds in the policies. There appears to have been some delay in realizing on the policies following the fire damage, and the premises remained in a damaged condition for a considerable time. During this period the lease was cancelled for nonpayment of rent and apparently also by reason of the fact that work had not been undertaken to reconstruct the improvements. This was in February 1966. Thereafter the lessor repaired the damages and reopened the motel.
 
 
 6
 As to the basis for the bank's claim to the proceeds of the business interruption insurance, the record shows that on August 11, 1965, the tenant wrote a letter relating to the recovery on the business interruption policies. This letter was directed not to the bank but to the insurance companies. It authorized and directed them to enter the name of the State Capitol Bank on the check for the claimed proceeds.[1] This letter was written following the tornado damage and before the fire damage. As indicated above, the lessor terminated the lease after the fire damage and thereafter the tenant made a formal assignment directly to the bank as security of all of the tenant's interest in the proceeds from insurance coverage on the motel.
 
 
 7
 The issues must be determined by construction of the provisions of the lease of the motel from the appellee to the tenant and by fixing the priority and effectiveness of the letter of August 11th and the formal assignment to the bank. There is no case law applicable to this issue as the resolution of the problem depends on the intent of the parties. The trial court found that under the terms of the lease, and the manner in which these terms had been construed by the parties, the insurance proceeds should be paid to the lessor.
 
 
 8
 The appellant bank raises an issue as to whether the lessor had an insurable interest to support its recovery on the business interruption proceeds. We do not consider this to be a substantial issue because the question on appeal as to the insurance proceeds is determined by the lease provisions, and not by the terms of the policies upon which the insurance companies had made payment. The issues here are between the bank as an assignee of the proceeds and the lessor.
 
 
 9
 The lessor finally undertook the restoration of the improvements on the premises and reopened the motel. All in all, the record shows that if in accordance with the trial court's decision the lessor is awarded all of the business interruption insurance, it will not then be fully reimbursed for the reconstruction costs and related expenses.
 
 
 10
 The lease of the motel contained detailed provisions as to the insurance that was required to be maintained by the tenant. This included public liability, workmen's compensation, rental income insurance to cover rents, taxes, and "additional rent" items in the lease, as well as fire and extended coverage. The lease also permitted the tenant to procure other insurance not required if it desired to do so, and the proceeds of such policies should be the property of tenant, with one exception to be hereinafter considered. The required "rental" insurance was initially obtained by the tenant but thereafter the business interruption endorsements were substituted therefor. The business interruption insurance had rent and tax elements as well as the ordinary business interruption provisions.
 
 
 11
 The provision of the lease above referred to provided that the optional insurance proceeds would be the property of the tenant, but the section (7.02) also stated that:
 
 
 12
 "* * * [E]xcept that if the buildings, improvements and betterments, furniture, furnishings, fixtures, equipment and other personal property, or any of them, are damaged or destroyed by a casualty not covered (i. e., either as to nature or amount of the loss) by insurance for the benefit of Landlord, any proceeds payable to Tenant under policies procured by Tenant for its own account, and covering such loss, shall be assigned by Tenant to Landlord to be held by Landlord subject to the provisions of Article 11 of this lease. Any additional insurance carried by Tenant shall not reduce the insurance required under this lease to be carried by Tenant on behalf of Landlord."
 
 
 13
 This same section of the lease also provided that policies covering the hazards required to be insured under the lease shall be payable to the mortgagee, the landlord, and the tenant as their interests may appear. The record shows that the policies here concerned had both the lessor and the lessee as named insureds.
 
 
 14
 The lease also made provision for the payment of the proceeds from the insurance coverage into a trust thereafter to be used for the reconstruction of the improvements on the premises. The lease also obligated the tenant at its sole cost and expense, and whether or not the insurance proceeds were sufficient, to restore and rebuild the improvements promptly in the event of damage.
 
 
 15
 The lease contained provisions relating to its termination, and in this section (31.12) mention is also made of insurance. The lease there stated that in the event of termination, among other things, there shall "pass to and become the property of the Landlord" all of the tenant's interest in "all insurance policies and proceeds of any insurance recovery or loss then paid or payable thereunder; * * *."
 
 
 16
 The trial court, as indicated above, construed section 7.02 of the lease to cover or include the business interruption insurance, and when considered with the strongly worded obligations placed upon the tenant to restore the premises, the insurance proceeds of whatever nature should be dedicated to such restoration to the extent necessary.
 
 
 17
 We agree with the trial court in its construction of the lease provisions. It should also be noted, as did the trial court, that the parties following the initial tornado damage utilized the trust provisions of the lease for the deposit of insurance proceeds, and at that time a portion of these proceeds included recovery on business interruption coverage. This was done until this suit was filed, and thereafter insurance proceeds were disbursed on order of the court.
 
 
 18
 The lease provisions relating to insurance and the tenant's obligation to restore the premises leads to the conclusion that it was intended that all insurance proceeds be dedicated for such purposes if the tenant was unable to rebuild out of its own funds. This becomes especially important in view of the fact that the tenant was never in a strong financial position from the time of the initial lease-back and had from the outset encountered financial difficulties.
 
 
 19
 The lease provision, section 11.01, is especially important in connection with the utilization of insurance proceeds. This section is entitled "Damage or Destruction," and in the first sentence requires the tenant, in the event the improvements are damaged, to restore them to their original condition whether or not insurance proceeds are sufficient for such purpose. Also as indicated above, the provisions relating to the required insurance coverage, and the permissive insurance coverage, contemplate that the insurance proceeds of whatever nature be used for the restoration of the improvements.
 
 
 20
 The appellant strongly urges that section 7.02 relating to the permissive insurance, and which provides that proceeds thereof shall be the property of the tenant, with the one exception, should be restricted to insurance relating to physical damage. The portion of the section which requires the assignment of the proceeds of permissive insurance to the landlord does refer to policies covering "such loss," and the last immediate reference is to the buildings, improvements, furnishings, fixtures, and equipment. However, all of the insurance proceeds here under consideration necessarily originated from damage to the physical plant, and this section of the lease relates to such damage. The coverage is for various types of losses to lessor and lessee. The business interruption insurance for loss of business is partly adjusted on a profit basis, profit to lessee, but under the lease provisions here used it is not unreasonable to include such coverage in "such loss" as used in the lease. The obvious overall intent of the lease to dedicate all insurance proceeds to rebuilding must overcome the narrow construction urged by the appellant. Thus the meaning given by the trial court to this provision of the lease is proper, and we agree therewith.
 
 
 21
 The commitment of the insurance proceeds originates in the lease, and it is held that this is prior to any assignments of proceeds made by the tenant to the bank whether before or after the loss. The lessor and the lessee thus agreed in the lease that insurance proceeds be used for restoration of the motel in the event of damage. Both were the named insureds in the policies, and before this suit business interruption proceeds were being deposited for this purpose in accordance with the lease. It does not appear to be necessary to decide into what particular category this pre-termination "dedication" of the proceeds falls; that is, whether it was some sort of an assignment or something else. The bank had constructive notice of the lease, it advanced some money to the lessee with knowledge of the tornado damage, it knew the lessor and the lessee were the named insureds. The bank then took no assignment to it from anyone. All there was were the letters by the tenant to the insurance companies quoted above. This was after the tornado damage and before the fire damage. It is sufficient to hold that the agreement to utilize the insurance proceeds for the joint benefit of the parties was effective as against the letters of August 11th, and the trial court was correct.
 
 
 22
 We have considered the other issues relating to liquidated damages, insurable interest, and others, but find it is not necessary to discuss them in view of the above disposition of the lease issues.
 
 
 23
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 "You are hereby authorized to enter the State Capitol Bank of Oklahoma City on the check due us on the business interruption coverage presently in process. It is specifically directed that the first moneys paid us shall be directed to the State Capitol Bank of Oklahoma City and until we have obtained a release from said bank showing full payment and satisfaction on money borrowed to meet our pay roll."